Hon Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| JUDI L. NICON-ORCUTT , | ) | NO.  2:15-cv-00343 MJP |
| Plaintiff, | ) | |
| | ) | PLAINTIFF'S RESPONSE |
| vs. | ) | TO DEFENDANT'S MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| | ) | |
| | ) | |
| FOREMOST INSURANCE COMPANY | ) | |
| GRAND RAPIDS, MICHIGAN | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW Plaintiff Judi L. Nicon-Orcutt,  through her undersigned attorney, and submits her response to the  Motion for Summary Judgment filed by Foremost Insurance Company Grand Rapids Michigan (hereafter referred to as "Foremost").

## INTRODUCTION

On November 13, 2013,  Judi L. Nicon-Orcutt's a manufactured, in which she had lived since 1996 and raised her three children, caught on fire and burned to the ground before the Local Fire District was able to arrive and extinguish the fire.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 1**

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

1.     The home was considered a total loss. In addition, virtually all of her personal property was destroyed and considerable damage was caused to a large covered wood deck which had stood alongside the home next to the front porch and which the plaintiff had constructed several years after the home had been placed on the property in 1996.

2.     In effect at the time of the fire was a Homeowners Insurance Policy ("policy") providing, as stated in the declaration page, $98,033 coverage for the total loss of the home and $49,016 coverage for the personal property.  It was immediately obvious after the fire that the home was a total loss and at no time has Foremost claimed otherwise.  After the plaintiff had completed the process of submitting her Proof of Loss documentation to the Foremost adjuster, James Pierce, acknowledged in early February of 2014 that her total personal property loss was just under the $49,016 coverage.  Plaintiff also had other claims relating to other coverages provided by the policy, such as debris removal and other structure coverage for the wooden deck. Despite the lack of any dispute that the home was insured for $98,033 and that plaintiff's personal property loss was right around the $49,016 provided by the policy, no payments, other than a $5,000 advance paid within a day or two after the fire and monthly living expenses,   were made by Foremost on plaintiff's claims until January of 2015,  more than a year after the fire, when Foremost sent two checks to the plaintiff. One was for the $98,033 claim for the loss of the home and the other for $44,016 which represented the amount of coverage on her personal property reduced by the

**Nelson, Brinson, Thigpen & Fryer, P.S.**
1811 "C" Street
Bellingham, WA 98225-4017
Telephone (360)676-9974
Fax (360)676-9978

$5,000 she had previously received.  The $98,033 check, in addition to naming Ms. Nicon-Orcutt as a payee, also named the two mortgagees – Caliber and WECU.

3.      These two checks were issued by Foremost just two days after the plaintiff  had taken legal action by mailing to Foremost and the Washington Insurance Commissioner the pre-suit Notice of Intention to File Legal Action required by RCW 48.30.015(8) before a lawsuit seeking damages under the Washington Insurance Fair Conduct Act may be formally commenced.

4.      The basis of plaintiff's lawsuit against Foremost is that Foremost violated numerous Washington Insurance regulations in the manner in which it handled plaintiff's claims.  In particular, the extraordinary and inexcusable delay in paying the plaintiff's claims caused her monetary damages which included, *inter alia,* attorney fees, penalties and interest on her mortgages, and the inability to qualify for the Foremost coverage, up to $19,606, for home replacement costs exceeding $98,033 for the reason that the policy required that such coverage was only available if the home were replaced within 365 days of the loss.  In addition the delay caused her great mental distress and anxiety due to bad faith on the part of Foremost.

## II. FACTS

5,      Because the plaintiff was not at home when the fire occurred and various fire investigators, including Will Anderson of the Fire Marshall's Office,  who inspected the debris were unable to determine how the fire started, speculation quickly arose that the fire might have been intentionally set and possibly by the plaintiff herself. Consequently, Foremost commenced an investigation which regarding the question as

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 3**

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

to whether Ms. Nicon-Orcutt intentionally caused the fire.  The investigatory activities and the  results obtained are as follows:

**(A)    November 14, 2013**:  Gwen Johnson and Glenn Johnson of a company known as Q Global, which had been retained by Foremost, arrived on the property and conducted an audio-recorded interview of the plaintiff and a forensic analysis of the fire debris to determine the cause and origin (C & O) of the fire.  As reflected by his  report (Exhibit 2, Stirling Decl.)  Mr. Johnson offered the conclusion that the <u>possibility</u> that the fire was of incendiary origin could not be ruled out.

The report also contains comments about the plaintiff's description of her activities preceding and leading up to the fire.  The report reflects that the plaintiff cooperated fully and answered all the questions about her activities preceding the fire and about her financial situation. .She stated that she was over a year behind din her mortgage payments and her home was schedule to go on the auction block in December but that through her uncle's estate she receives $10,000 every December and was going to use the money to come partially current on the double mortgage.

There is no record of any further investigatory activities conducted by Q Global.

**(B)    December 26, 2013**:  Benjamin Dy, as part of his investigation telephone the Fire Marshall's office on a number of occasions. On this date, December 26, 2013, the spoke with Will Anderson and became aware that after talking with the Foremost C & O (Glenn Johnson) Anderson was going to change his initial report in which he concluded that fire was started by a space heater. **Exhibit 10,** Thigpen Declaration.

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA 98225-4017
Telephone (360)676-9974
Fax (360)676-9978

Anderson had at one time written a report indicating that the cause of the fire was undetermined. **Exhibit 5,** Thigpen Decl. page 1 of 8 of Will Anderson Report.

**(C)     January 29, 2014.** Investigator Benjamin Dy conducted a lengthy audio-recorded interview of the plaintiff.   A summary of his report was contained in the Foremost claim file.  It is attached to the declaration of the plaintiff.  **Exhibit 19,** Nicon-Orcutt Decl.   Mr. Dy asked the plaintiff many questions about the plaintiff's activities on November 10, 2013 and after midnight up until the time of the fire.   Mr. Dy's summary indicates that the plaintiff described that after going to a movie in Bellingham she came back to her property to drop off her son Justin and his girlfriend Kaylee and then went to the Nooksack Casino with her other son, Jesse, who had also been to the movie She and Jesse left the casino around 1:30 a.m. to drive back  to Bellingham to take Jesse home and that while she was doing so she received a call from Justin who told her the house was on fire. [This report inadvertently states 1:30 p.m. rather than 1:30 a.m.]  During the interview the plaintiff stated she had not had any contact from law enforcement since she had had contact when he came to her property.  According to  Mr. Dy, the plaintiff denied any complicity regarding the fire and pointed out that the fire had put her grandfathered-in daycare license in jeopardy.

**(D)     February 3, 2013**:  Benjamin Dy spoke with Will Anderson who informed him that the crime lab had completed testing of the items which Anderson had removed from the debris on November 18 and sent to the lab for testing and that the lab had found no evidence of accelerants. See **Exhibit 8**, Thigpen Decl. for copy of the Washington State Patrol rime lab report written by forensic scientist, Janice Wu.

**Nelson, Brinson, Thigpen & Fryer, P.S.**
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

**(E)    February 11, 2013:**  Dy received a telephone call from Anderson and informed Anderson that Foremost had not paid on the claim yet [plaintiff's claim] and that Anderson told him that he would be calling her (plaintiff) today and asking her to take a polygraph. **Exhibit 29,**  Thigpen Decl.

**(F)    February 14, 2014:**  On this date Nancy Sterling spoke  with the plaintiff for about 45 minutes according to claim file entry which is attached  as  **Exhibit 7** to the Nicon-Orcutt Decl.    During this call, plaintiff questioned why Foremost wanted her phone records and asking so many questions.   Nancy Sterling said that the phone records would support the time line of events. Nancy Sterling also asked plaintiff if she had contacted the Fire Marshall and that plaintiff said she had left a message.  Nancy Sterling told the plaintiff that the F/M investigation and obtaining phone records were necessary as part of the Foremost evaluation and investigation.  .Plaintiff also brought up the topic of the deck and explained that the deck was post and beam construction on blocks and not attached. Nancy Sterling then told the plaintiff that "those items can be evaluated once we determine our next steps which was dependent on us  being able to conclude our investigation."  For further information about this conversation, see the Nicon-Orcutt Declaration ¶ 37

**(G)    February 19, 2014:**  Dy had spoken to plaintiff and instructed her to contact the F/M's Marshall's] office because they want to talk to her.   He learned also on the same day that Mitch of the F/'s office that he had contacted plaintiff and told her to contact Detective Gum to set up a  polygraph. **Exhibit 11,** Nicon-Orcutt Decl.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 6**

*Nelson, Brinson, Thigpen & Fryer, P.S.*
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

CASE 2:15-cv-00343-MJP   Document 30   Filed 01/05/16   Page 7 of 18

**(H).**   **February 25, 2015**:  Dy  received a telephone call from the plaintiff who reported to him that she had attempted to reach Detective Gum several times but that he had not responded.  When she asked Dy why Detective Gum would want to see her he explained that he wanted to conduct a polygraph.  The plaintiff responded that it was not in her interest to burn down her won house.  She told Dy that she would keep trying to reach Gum  **Exhibit 13,**  NIcon-Orcutt Decl.

**(I).**   **February 27, 2014**: Dy reports that he will continue to follow up with L/E (Law Enforcement) regarding a polygraph for the plaintiff.  He  further reported that Foremost had recently decided to have Foremost attorney involved to try to obtain plaintiff's cell phone records.  **Exhibit 29,** Thigpen Decl.

**(J).**   **March 26, 2014**:  Dy received a call from Mitch Nolze "advising that he is referring the polygraph request to Sgt. Crisp**."**    **Exhibit 29,** Thigpen Decl. (This suggests that Foremost was actually equesting the Sheriff's Office to conduct the investigation that Foremost was required to do.

**(K)**   **March 27, 2014**:  Attorney Thomas Lether conducted a lengthy interview called an (Examination Under Oath) of the plaintiff at his office.  Like Mr. Dy, he asked the plaintiff many questions about her activities preceding the fire and her financial situation.

**(L).**   **April 24, 2014**:  Dy reported that he spoke with Sgt. Crisp who explained they (Sheriff's Department only have two polygraphers and they have several cases in front of her.  **Exhibit 29,**  Thigpen Decl.

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

The above description of activities constitutes the entire "investigation" conducted by Foremost with respect to what it continually referred to as its ongoing or continuing investigation.   In sum, all that Foremost did in terms of an investigation during 2014 was to interview the plaintiff on two occasions and check up from time to time with the Fire Marshall's Office to find out  if the polygraph had been scheduled.. The March 26, 2014 entry in the Foremost claim file in which Mr. Dy is told that the polygraph request is being referred to Sgt. Crisp (**Exhibit   29,**  Thigpen Decl.) suggests that Foremost was more interested in having a polygraph taken then Law Enforcement was.   In fact, the Mitch Nolze comment recorded in the claim file for Mrach 26, 2014 that   "he [Mitch Nolze] is referring the polygraph request to Sgt. Crisp**."** Suggests that  Foremost was prodding the F/M' office to mekae sure the polygraph was taken.   **Exhibit 29,** Thigpen Decl.

6      It is not an exaggeration to describe the Foremost investigation during March, April and May as woefully inadequate and unreasonable.  When it is reviewed in totality it becomes apparent that almost nothing of any significance was undertaken other than, perhaps the original C & O investigation by  Q Global which consisted of an initial interview of the plaintiff, inspecting the fire debris and preparing a report. However, even the report was inadequate and incomplete as discussed bellow.

7.      Basically, the Foremost investigation it was really nothing more than making several phone calls telephone calls in effort to promote a polygraph examination of the plaintiff.  It appears that that law enforcement was apparently less interested in accomplishing this than Foremost and rather thaan conducting other

**Nelson, Brinson, Thigpen & Fryer, P.S.**
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

investigatory aactivties, Foremost sat on its hands.   Meanwhile the plaintiff was receiving regular letters from Foremost telling her that "we can neither affirm nor deny your claim at this time as the investigation is not competed. See **Exhibit 25,** Nicon-Orcutt Declaration

8.    Based on the above facts, it appears that from Foremast's perspective, the investigation would not be completed until the polygraph was conducted.   The plaintiff had no hesitation in taking a polygraph as evidenced by her multiple telephone calls in an attempt to reach Detective Gum who she was told would set it up but recveiving no response to the messages she left.   Nicon-Orcutt Decl. § 48. See also **Exhibits 12, 13** Nicon-Orcutt, Decl. describing the frustration she encountered in continuously leaving messages for Detective Gum without return call.   Since she was willing to take a polygraph and had been told directly by Benjamin Dy on February 25, 2014 **(Exhibit 13,** Nicon-Orcutt Decl.) that the Fire Marshall's Office wanted to see her to have it done why did Benjamin Dy just not suggest to her that Foremost could make arrangements to have it done.   Presumably, if had taken asked the plaintiff if she were willing to take a polygraph at their request, she would have agreed.

9.    What also should be considered in determining   whether Foremost conducted a reasonable and prompt investigation and whether holding up the payment if plaintiff's claims due because the investigation had not been completed is to consider what the actions Foremost failed to take. These actions or omissions are discussed below:

**Nelson, Brinson, Thigpen & Fryer, P.S.**
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

10.     **Failure to Secure Videotape at Nooksack Casino.**  Although Foremost had suspicions about the fire very shortly after it occurred, no Foremost investigators went to the Nooksack Casino to secure the videotape that could have been reviewed Filed herewith is the Declaration of Donald Arnette who is the security manager at the Nooksack Casino.  He states that the videotape is usually retained about 7 days but that nobody ever contacted him to ask to see it for that period of time.  In this regard, it should be noted that the plaintiff was interviewed just three days after the fire by Gwen Johnson of Q Global.  **Exhibit 2,** Stirling deposition.  The report describes at page 2 what the plaintiff said about her activities preceding the fire and that she mentioned she had been at the Nooksack Casino.  At the same time, there was some suspicion about her time line  pertaining to where she had been at different times during the course of the evening and particularly just before the fire.  The failure to secure the tapes was an obvious opportunity wasted insofar establishing the all important time line and borders on negligence. The only portion of the time line that is critical is  not what time the plaintiff walked out the casino door as the defendant seems to suggest. (See Defendant's Motion at page 2, line 11)  but what time she actually departed the parking lot and entered the highway to Bellingham his question would presumably have ben answered by reviewing the video. tapes.  When the plaintiff was interviewed on Jaanuary 29, 2014 by Benjamin Dy she estimated that she recalled that she and Jesse left about 1:30.    Defendant's entire theory that the defendant had the opportunity to set the fire because she had left the casino at 1:00 suggests that

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 10**

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

11,   **Failure to Timely Obtain Reports.  Fire reports. Interview Potential Witnesses,** Foremost did not even request the Sheriff's report until July 21, 2014 when they were requested by attorney Christopher Sharkey (**Exhibit 5,** Decl. Nancy Stirling)  while at the same time regularly informing the plaintiff that the investigation was continuing and ongoing.   **Exhibit 25,** Nicon-Orcutt  Declaration

12.   **Failure to Timely Obtain Other Reports.**   It appears that Glenn Johnson did not include any information in his report as to the actual time the fire was initially reported and what time the local Fire District arrived.  His report merely states that the fire occurred "on Monday, November 11, 2013"  Had the information as to the time the fire started been included in the report it might have occurred to somebody to request the casino videotapes to obtain information about the all important time line.  There is no mention as to whether Foremost ever bothered to obtain the report prepared by Jerry DeBruin, who is the chief of the Local District 14 whiuch extinguished the fire.   **Exhibit 2,** Nicon-Orcutt Decl.

**Failure to Conduct Interviews**

13.   One of the first persons to se the plaintiff after the fire was extinguished was Jerry DeBruin who is the fire chief for the Local Fire District 14.  **Exhibit 2;** Nicon-Orcutt Decl.  Plaintiff had a conversation with him at the scene right after the fire. In her declaration, the plaintiff describes what Mr. DeBruin told her what he remembered when she went to the fire hall to pick up a copy of his report.  Nicon-Orcutt Decl. ¶ 25.  A thorough investigation would included at least an attempt to make contact with Mr.

PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 11

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

DeBruin to ask if he was acquainted with the plaintiff, whether he saw her at the scene of the fire, what she say what was her demeanor, what is her reputation?

14.     It also appears that the Foremost investigation did not include interviews of any employees of the Nooksack Casino.  The plaintiff was willing to answer all the questions  she was as asked  but it appears that Glenn Johnson did not ask her if she thought any of the employees of the casino would remember her being there, whether she remained inside the entire time or temporarily leave for a sufficient period of time to drive from the casino to her home, start a small fire that wouldn't take full effect  for hour so an hour or two return to the casinoEmployees who were working the at the time just before the fire  should have been interviewed to ascertain if any of them are acquainted with the plaintiff, whether they emembered seeing her that morning, whether she was there the entire time,


.**Failure to Follow Up on information provided about the salt crystal lamp**.

15.     When he departed her property on November 14 Glenn Johnson told Judi to let him know if she thought of anything important that she might not have remembered when the interview was conduct.  Not too long after that she remembered that earlier in the day in anticipation of painting a wall in the bedroom she had picked up a salt crystal lamp from her vanity set it on the carpet while the light was still on.  Nicon-Orcutt Decl. ¶22.  Nicon-Orcutt Decl. ¶22.  What was disturbing to her was that nobody at Foremost followed up on this new information.  This hit home when Richard Carman hired by plaintiff as an expert in this case found the remains of the basket

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA 98225-4017
Telephone (360)676-9974
Fax (360)676-9978

during his inspection of the debris in April of 2015 and ultimately concluded that, more likely than not the fire was accidental.

16.   Plaintiff is compelled herein to address the highly disingenuous statements if the defendant under facts.  The defendant states at page 3l lines 10-15 that "The Sheriff wanted to conduct the polygraph examination of the insured. However, the Plaintiff never appeared for a polygraph examination."  As is well known and discussed above, the reason the polygraph did not occur was because Detective Gum did not return her many calls and because the Sheriff's Office had only two polygraph examiners and there were cases ahead of plaintiff.

17.   As for Will Anderson upon whom it seems the defendant is relying to justify its decision not to pay plaintiff's claims, it must be remembered that Mr. Anderson changed his opinion after he spoke with Glenn Anderson who was hired by Foremost. **Exhibit 10,** Thigpen Decl.  Anderson could not remember even estimate the date when he wrote his reports, and he acknowledged there was no probable cause to arrest anyone See **Exhibits 8, 10, 11 & 12,** Thigpen Decl.

**Lack of Meaningful Investigation Activties**

18.   There never was any credible evidence that the plaintiff started the fire at her home. Thee were no investigatory activies ofg any significance by defendant during the month February, Defendant states in its Summary Judgemnt Motion at page 4, line 15 that to secure more information about the loss and the claim, Foremost requested that the insured appear  for an Examination Under Oath (EUO) on March 27, 2014.  See **Exhibit 14,** Nicon-Orcutt Decl. which is a copy of the letter dated

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

March 14, 2014 sent to plaintiff requiring her attendance at the EUO.  A look at the phenomenal list of documents that are described in this letter  and which plaintiff was required to produce on short notice was upsetting and surprising to her. See Nicon-Orcutt Decl. ¶ ¶ 56, § 57, 58 after the fire

19.    Furthermore, on January 3, 2014 plaintiff had signed a broad authorization, **Exhibit 10** to the Nicon-Orcutt Declaration,  to enable Foremost  to obtain just about any records it desired so there was no reason for Foremost to put the burden on the plaintiff to gather the voluminous records described in attorney Lether's March 14, 2014 letter.  In addition the plaintiff had already answered a multitude of questions asked of her by Benjamin Dy on January 29, 2014 at a full-blow tape-recorded interview.  Thus, There appeared to little to be gained by the EUO such that it was  redundant and meant further delay.

20,    After the EUO was completed, Foremost literally conducted no meaningful   investigatory activities but continued to represent to the plaintiff that it could not affirm or deny her claim because the investigation had not been completed. pay any claims because the investigation had not been completed.  At page 6, lines 1-3 of its Motion, Foremost states that it "attempted to confirm the time of the 911 call in light of the cell phone carrier's refusal to provide cell phone records."  Notwithstanding the lack of specifics as to what attempts were made and why this undertaking was even necessary, such a statement begs the question as to why this was not previously done.

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

**Attempts to Settle Claim**

21.   During May and July of 2014 considerable correspondence was exchanged between counsel about the cell phone records.  Thigpen Declaration  ¶ ¶ ¶  26, 27, 28, it became apparent that Foremast's attorney had made no effort to obtain the records.   Accordingly, , further efforts to obtain the records were abandoned.  It also was now clear  that there would be no interview with Jesse. Consequently, there was nothing left for the plaintiff to do in the way of providing records, etc. It was again requested that Foremost make its position known whether it was going to pay plaintiff's claims. Up until the middle of August there had been no discussion about settling the claims.  Foremost had nor disclosed what it was going to do, I.e. pay the claims or not pay the claims. .

22.   By letter dated September 19, 2015 she submitted her "demand" in writing.   Exhibit 26, attached to the Nicon-Orcutt Declaration filed herewith is a true and correct copy of the September 19, 2014 "demand letter" which had been faxed to Lether & Associates the same day. Essentially, Ms. Nicon-Orcutt's demand was that Foremost pay what she believed it was obligated to pay under the policy, i.e. ($98,033) for the total loss of her home and ($49,016) the loss of her personal property.   Other claims were set forth as well. **Exhibit 26,**  Nicon-Orcutt Decl. Eecl. Nicon-Orcutt Decl.

23.   When there was not a prompt response to the plaintiff's letter of September 192014, a letter date September 267, 20145 was sent to Lether & Associates terminating the mediation agreement. **Exhibit 27,** Nicon-Orcutt Decl.  ¶ 37.

PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 15

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA 98225-4017
Telephone (360)676-9974
Fax (360)676-9978

24.    A week later, on October 6, 2014, a letter setting forth Foremost's position was received,   Exhibit  28,  attached to the Nicon-Orcutt Declaration filed herewith is a true and correct copy of this October 6, 2014 letter from Lether & Associates.  Foremost offered to pay considerably less than the $98,033 it owed for the total loss of the plaintiff's home and only about half of the coverage for the loss of her personal property.  Effectively, Foremost denied plaintiff's claims and asserted as a rationale that "Foremost has concluded that the fire was intentionally set."   It was further stated that the plaintiff had the motive and opportunity to set the fire.  It also stated, "we understand that you have not responded to law enforcement's request that you submit to a polygraph examination."  **Exhibit  28,** Nicon-Orcutt Decl. Eecl.

25..    In addition to refusing to pay the full amounts of the claims for her home and personal property Foremost rejected the claim for the deck under the   "Other Structure" coverage  of the policy.  **Exhibit 1,** Thigpen Decl.

26.    Plaintiff then decided  to try to qualify with Caliber for what was called a "Hardship Allowance" whereby Caliber might agree to allow her to pay off her mortgage for an amount less than the principal balance. The application required that Foremost prepare a  "Letter of Intent" as it was called,  to assure Caliber that the funds were in place to be paid if it agreed to allow p[plaintiff to pay off her mortgage balance for $40, 000  Thigpen decl. ¶ 39

27,    The application was made to Caliber but was ultimately eject on January 2, 2015.

**Nelson, Brinson, Thigpen & Fryer, P.S.**
1811 "C" Street
Bellingham, WA 98225-4017
Telephone (360)676-9974
Fax (360)676-9978

28,.    Plaintiff then made one last attempt to persuade Foremost o pay her in full for her claims by faxing a demand  Lether & Associates on January 9, 2015, However, Foremost did not respond by the deadline presented so a   Notice of Intention to file legal action under RCW 48.30.15 was mailed to Caliber. Several days later, Foremost sent two checks to the office of plaintiff's attorney, one for the full coverage on the home in the amount of $98,033 and the other for $44,016 for the personal property.

## LAW & ARGUMENT

The evidence in this case is overwhelming that defendant Foremost violated numerous Washington Administrative Code provisions in the manner in which it handled plaintiff's insurance claim due to the November 11, 2013 fire. Plaintiff requests that defendant's Motion for Summary Judgment be denied. Plaintiff asks for the opportunity to present a full oral argument

DATED this 4th day of January,  2016.


/s/ Jeffrey A. Thigpen

Jeffrey A. Thigpen WSBA #11714
1811 C Street
Bellingham, WA 98225
360-676-9974

thigpenjeffrey@gmail.com


PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 17

Nelson, Brinson, Thigpen & Fryer, P.S.
1811 "C" Street
Bellingham, WA  98225-4017
Telephone (360)676-9974
Fax (360)676-9978

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under the laws of the United States and the State of Washington that on the 4th day of January, 2016 he served this document entitled "Response to Motion for Summary Judgment"  upon the persons identified below and in the manner indicated.

Thomas Lether
Lether & Associates
1848 Westlake Avenue N., Suite 100
Seattle, WA 98109

Eric Neal
Lether & Associates
1848 Westlake Avenue N., Suite 100
Seattle, WA 98109

By:    [ x ]  CM/ECF                    [  ]  Facsimile Transmission: (206) 467-5544

       [  ]  First Class Mail            [  ]  Hand Delivery to Lether & Associates Office

                                              at 1848 Westlake Avenue N., Suite 100

                                              in Seattle, Washington

Signed this 4th  day of January, 2016at Bellingham, Washington.


       /s/ Jeffrey A. Thigpen
       Jeffrey A. Thigpen

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 18**